UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| ANNE CUTLER, Derivatively on Behalf of, WALGREEN CO., | ) ) ) | Case No. |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| GREGORY D. WASSON, JAMES A. SKINNER, WILLIAM C. FOOTE, STEFANO PESSINA, ALAN G. MCNALLY, NANCY M. SCHLICHTING, ALEJANDRO SILVA, STEPHEN A. DAVIS, MARK P. FRISSORA, GINGER L. GRAHAM, DAVID J. BRAILER, DOMINIC P. MURPHY, JANICE M. BABIAK, WADE D. MIQUELON, and DAVID Y. SCHWARTZ, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| – and – | ) ) | |
| WALGREEN CO., a Illinois corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

1.      This is a shareholder derivative action brought on behalf of nominal defendant Walgreen Co. ("Walgreens" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  As detailed below, for nearly a year the Individual Defendants (as defined herein) improperly refused to disclose well-known and highly material information concerning the Company's dire struggles with increasing generic drug prices, a severe step-down of reimbursements via the federal Medicare Part D program, and the resulting dramatic declines in the Company's business forecast, including a ***multi-billion dollar decline*** in Walgreens' earnings before interest and tax ("EBIT") goal.  After Walgreens finally admitted the staggering operating profit shortfall, the Company entered into a separation agreement with its Chief Financial Officer ("CFO"), defendant Wade D. Miquelon ("Miquelon"). As discussed in further detail below, defendant Miquelon then commenced a lawsuit against Walgreens on October 16, 2014, in the Chancery Division of the Circuit Court of Cook County, Illinois (the "Miquelon Complaint") alleging that the Company, through its officers, employees, and directors, had disparaged and defamed him in connection with the forecasting shortfall and his departure.  The Miquelon Complaint, along with several previously undisclosed internal Walgreens documents attached thereto, provides detailed insight into the Company's inadequate internal controls and repeated failures to timely inform its shareholders of material business developments.  These wrongs resulted in billions of dollars in damages to Walgreens' reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to billions of dollars in potential liability for violations of state and federal law.

2.      Walgreens, together with its subsidiaries, operates the largest drugstore chain in the United States.  As of the end of fiscal 2014, the Company operated 8,309 locations throughout the nation, and nearly 99% of those locations contain pharmacies.  For years, drug

sales have represented the Company's largest product class, accounting for 74%, 73%, and 75% of total sales in fiscal 2014, 2013, and 2012, respectively. The Company's drug purchasing and sales are intimately tied to its EBIT, a key financial metric that is closely followed by investors and analysts. As such, Walgreens' Board of Directors (the "Board") pays particularly close attention to the Company's drug procurement and sales. In fact, according to the Miquelon Complaint, executives in charge of Walgreens' generic drug procurement reported directly to defendants Miquelon, Gregory D. Wasson ("Wasson"), and Stefano Pessina ("Pessina"), while executives overseeing all third-party contracts and related negotiations reported directly to defendant Wasson. Wasson and Miquelon, according to the Miquelon Complaint, reported directly to the Board on issues concerning the Company's EBIT, including generic drug pricing.

3. In June 2012, Walgreens announced that it would acquire a 45% equity stake in European pharmacy company, Alliance Boots GmbH ("Alliance Boots") for $6.7 billion (the "First Step Acquisition"). At the same time, Walgreens procured the option to acquire the remaining 55% of Alliance Boots during the six-month period beginning two and a half years after the closing of the First Step Acquisition for a stock and cash mix valued at that time at $9.5 billion (the "Second Step Acquisition"). Though Walgreens technically had the ability not to follow through with the Second Step Acquisition, the Company's executives believed that they were getting such a good deal with Alliance Boots that it was only a matter of when, not if, the Second Step Acquisition would occur. Among the matters touted by Walgreens in announcing the First Step Acquisition, was that the transaction would be substantially accretive to the Company and that the combined companies would have "unmatched supply chain and procurement expertise."

4.      Thus, in August 2012, when the First Step Acquisition closed, the Company and Alliance Boots already began working closely together to create a set of goals for fiscal year ("FY") 2016, which was anticipated to be the first full fiscal year of operation as a combined company.  These publicly announced FY 2016 goals included, among other things, $9 billion to $9.5 billion in adjusted EBIT.

5.      The cost of generic drugs, however, began to skyrocket after the close of the First Step Acquisition.  As reported by the National Community Pharmacists Association ("NCPA"),[1] in the second half of 2013, pharmacy acquisition prices for essential generic drugs increased "by as much as 600%, 1,000% or more, according to a survey of more than 1,000 community pharmacists."  The exploding costs of generic drugs were widely reported in numerous media outlets throughout 2014, including *Time Magazine*, *Bloomberg*, and others.

6.      As generic drug prices continued to soar, the Company's internal EBIT forecast continued to decrease, even as Walgreens pushed up the date to for completion of the Second Step Acquisition.  The Company's executives initially lowered EBIT forecast to $8.7 billion in July 2013, and continued to spiral downward thereafter, plummeting to an internal estimate of $7.2-7.5 billion by late May 2014.  As disclosed in the Miquelon Complaint, and as further detailed herein, the Board was regularly informed of the consistently decreasing EBIT forecast. Nonetheless, through June 2014, the Individual Defendants repeatedly touted that Walgreens was on track to meet its FY 2016 goals.

---

[1] The NCPA, founded in 1898, represents America's community pharmacists, including the owners of more than 23,000 pharmacies. The nation's community pharmacies, pharmacy franchises, and regional chains dispense nearly half of the nation's retail prescription medications.

7.     On June 24, 2014, during the Company's third quarter 2014 earnings conference call, the Company finally admitted that Walgreens was forced to withdraw its FY 2016 goals and that the Company no longer expected to achieve the EBIT goal of $9 billion to $9.5 billion.  At the time, however, the Individual Defendants gave no indication of the drastic nature of the shortfall, the devastating effects of skyrocketing generic drug procurement costs, or the Company's continuing struggles with third-party reimbursement negotiations.

8.     In an August 6, 2014 press release, Walgreens finally disclosed the full extent of the Company's shortfall.  With respect to the EBIT goal, defendant Wasson announced the same day on a conference call that Walgreens expected "an adjusted EBIT range with mid-point around $7.2 billion," a full two billion dollars less (24%) than the $9 to $9.5 billion the Company repeatedly claimed it was "focused on delivering."   The press release also disclosed that Walgreens had entered into an agreement with Alliance Boots to accelerate the Second Step Acquisition and exercise the Company's option to acquire the remainder of Alliance Boots that Walgreens did not already own.  The combined Walgreens and Boot Alliance global enterprise, known as Walgreens Boots Alliance, Inc. ("WBA"), would be domiciled in the United States, rather than overseas as some investors expected.  Finally, the press release announced that the Company would be reducing its 2016 forecasted pharmacy unit earnings by $1.1 billion, in part because of a step-down of reimbursements via the federal Medicare Part D program.

9.     In the wake of the above disclosures, Walgreens' stock plunged nearly 15%, or $9.91 per share on August 6, 2014, to close at $59.21 compared to the previous trading day's closing of $69.12, erasing almost *$9.5 billion* in market capitalization.  Further, as a direct result of this unlawful course of conduct, the Company is now the subject of numerous federal

securities class action lawsuits filed in the United States District Court for the Northern District of Illinois on behalf of investors who purchased Walgreens' shares.

## JURISDICTION AND VENUE

10. This Court has jurisdiction under 28 U.S.C. §1332 because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have. This Court has supplemental jurisdiction under 28 U.S.C. §1367.

11. This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12. Venue is proper under 28 U.S.C. §1391(a) because Walgreens maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

13. Plaintiff Anne Cutler was a shareholder of Walgreens at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Walgreens shareholder. Plaintiff is a citizen of Massachusetts.

**Nominal Defendant**

14.     Nominal Defendant Walgreens is an Illinois corporation with principal executive offices located at 108 Wilmot Road, Deerfield, Illinois.  Accordingly, Walgreens is a citizen of Illinois.  Walgreens, together with its subsidiaries, operates the largest drugstore chain in the United States with net sales of $76.4 billion in the FY ended August 31, 2014.  The Company offers consumer goods and services, pharmacy, and health and wellness services through drugstores, as well as through mail, telephone, online, and a mobile application.  As of August 2014, Walgreens operated 8,309 locations in the United States, Puerto Rico, and the U.S. Virgin Islands.  In FY 2014, an average of 6.2 million shoppers visited Walgreens stores daily and the Company filled approximately 699 million prescriptions, accounting for 19% of the U.S. retail prescription drug market.

15.     As of the end of fiscal 2014, nearly 99% of the Company's locations contain pharmacies.  For years, drug sales have represented the Company's largest product class, accounting for 74%, 73%, and 75% of total sales in fiscal 2014, 2013, and 2012, respectively.  The Company's drug purchasing and sales are intimately tied to its EBIT, which is a strong indicator of the Company's profitability.  Historically, brand name drugs typically result in higher sales revenues for the Company, while generic drugs typically generate higher gross profit margins.  As the Company explains in its Annual Reports on Forms 10-K filed with the SEC, Walgreens' sales and profit margins can be adversely affected by changes to both brand name and generic drug purchasing and sales.  As such, the Board pays particularly close attention to the Company's drug procurement and sales.  In fact, according to the Miquelon Complaint, executives in charge of Walgreens' generic drug procurement reported directly to defendants Wasson and Pessina, while executives overseeing all third-party contracts and related

negotiations reported directly to defendant Wasson.  In addition, according to the Miquelon Complaint, defendants Miquelon and Wasson would report to the entire Board on issues concerning the Company's EBIT forecasts, including pricing of generic drugs.

**Defendants**

16.     Defendant Wasson is Walgreens' President and has been since May 2007 and Chief Executive Officer ("CEO") and a director and has been since February 2009.  Defendant Wasson was also Walgreens' Chief Operating Officer from May 2007 to February 2009; Executive Vice President from October 2005 to May 2007; and held various other positions with the Company beginning in 1980.  Upon the completion of the Company's pending acquisition of the remaining 55% of Alliance Boots, defendant Wasson will retire as Walgreens' President, CEO, and a director.  Defendant Wasson knowingly, recklessly, or with gross negligence failed to ensure timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated. Defendant Wasson also knowingly, recklessly, or with gross negligence made misleading statements in the Company's U.S. Securities and Exchange Commission ("SEC") filings concerning Walgreens' ineffective internal controls.  Walgreens paid defendant Wasson the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|----------------------------------------------|------------------------|-------|
| 2014 | $1,381,667 | $8,540,764 | $4,059,339 | $1,507,744 | $25,323 | $1,217,718 | $16,732,555 |
| 2013 | $1,333,333 | $6,836,271 | $2,724,490 | $2,047,499 | $21,895 | $691,148 | $13,654,636 |
| 2012 | $1,295,833 | $6,256,682 | $2,662,239 | $1,150,052 | $18,948 | $657,304 | $12,041,058 |

Defendant Wasson is a citizen of Illinois.

17.     Defendant James A. Skinner ("Skinner") is Walgreens' Chairman of the Board and has been since July 2012 and a director and has been since July 2005.  Defendant Skinner was also a member of Walgreens' Audit Committee from at least November 2011 to July 2012. Upon the completion of the Company's pending acquisition of the remaining 55% of Alliance Boots, defendant Skinner will become Walgreens' Executive Chairman of the Board.  Defendant Skinner knowingly or recklessly failed to ensure timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated.  Defendant Skinner also knowingly or recklessly made misleading statements in the Company's SEC filings concerning Walgreens' ineffective internal controls. Walgreens paid defendant Skinner the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $385,000 | $175,024 | $79,857 | $639,881 |
| 2013 | $380,000 | $170,010 | $55,901 | $605,911 |
| 2012 | $138,804 | $154,988 | $34,050 | $327,842 |

Defendant Skinner is a citizen of Illinois.

18.     Defendant William C. Foote ("Foote") is a Walgreens director and has been since January 1997.  Upon the completion of the Company's pending acquisition of the remaining 55% of Alliance Boots, defendant Foote will become Walgreens' Lead Independent Director.  Upon the completion of the Company's pending acquisition of the remaining 55% of Alliance Boots, defendant Foote will become Walgreens' Executive Chairman of the Board.  Defendant Foote knowingly or recklessly failed to ensure timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the

federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated. Defendant Foote also knowingly or recklessly made misleading statements in the Company's SEC filings concerning Walgreens' ineffective internal controls. Walgreens paid defendant Foote the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $105,000 | $175,024 | $46,532 | $326,556 |
| 2013 | $100,000 | $170,010 | $35,992 | $306,002 |
| 2012 | $100,000 | $154,988 | $25,293 | $280,281 |

Defendant Foote is a citizen of Wisconsin.

19. Defendant Pessina is a Walgreens director and has been since August 2012. Defendant Pessina is also a member of Walgreens' Finance Committee and has been since October 2012. Upon the completion of the Company's pending acquisition of the remaining 55% of Alliance Boots, defendant Pessina will become Walgreens' Acting CEO. Defendant Pessina knowingly or recklessly failed to ensure timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated. Defendant Pessina also made knowingly or recklessly misleading statements in the Company's SEC filings concerning Walgreens' ineffective internal controls. Defendant Pessina is a citizen of Monaco.

20. Defendant Alan G. McNally ("McNally") is a Walgreens director and has been since January 1999. Defendant McNally was also Walgreens' Chairman of the Board from October 2008 to July 2012; Acting CEO from October 2008 to February 2009; and Lead Director from January 2008 to October 2008. Defendant McNally is a member of Walgreens'

Finance Committee and has been since July 2012. Defendant McNally knowingly or recklessly failed to ensure timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated. Defendant McNally also knowingly or recklessly made misleading statements in the Company's SEC filings concerning Walgreens' ineffective internal controls. Walgreens paid defendant McNally the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $85,000 | $175,024 | $31,958 | $291,982 |
| 2013 | $80,000 | $170,010 | $27,070 | $277,080 |
| 2012 | $338,424 | $154,988 | $19,757 | $513,169 |

Defendant McNally is a citizen of Florida.

21.   Defendant Nancy M. Schlichting ("Schlichting") is a Walgreens director and has been since October 2006. Defendant Schlichting is also a member of Walgreens' Audit Committee and has been since at least November 2011. Defendant Schlichting knowingly or recklessly failed to ensure timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated. Defendant Schlichting also knowingly or recklessly made misleading statements in the Company's SEC filings concerning Walgreens' ineffective internal controls. Walgreens paid defendant Schlichting the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $85,000 | $175,024 | $58,422 | $318,446 |

| | | | | |
|---|---|---|---|---|
| 2013 | $80,000 | $170,010 | $44,307 | $294,317 |
| 2012 | $80,000 | $154,988 | $28,913 | $263,901 |

Defendant Schlichting is a citizen of Michigan.

22.     Defendant Alejandro Silva ("Silva") is a Walgreens director and has been since January 2008.  Defendant Silva is also a member of Walgreens' Audit Committee and has been since at least November 2011.  Defendant Silva knowingly or recklessly failed to ensure timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated.  Defendant Silva also knowingly or recklessly made misleading statements in the Company's SEC filings concerning Walgreens' ineffective internal controls.  Walgreens paid defendant Silva the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $85,000 | $175,024 | $49,135 | $309,159 |
| 2013 | $80,000 | $170,010 | $36,397 | $286,407 |
| 2012 | $80,000 | $154,988 | $22,621 | $257,609 |

Defendant Silva is a citizen of Illinois.

23.     Defendant Stephen A. Davis ("Davis") is a Walgreens director and has been since March 2009.  Defendant Davis was also a member of Walgreens' Finance Committee from at least November 2011 to July 2012.  Defendant Davis knowingly or recklessly failed to ensure timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated.  Defendant

Davis also knowingly or recklessly made misleading statements in the Company's SEC filings concerning Walgreens' ineffective internal controls. Walgreens paid defendant Davis the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $105,000 | $175,024 | $38,821 | $318,845 |
| 2013 | $100,000 | $170,010 | $27,166 | $297,176 |
| 2012 | $82,772 | $154,988 | $15,025 | $252,785 |

Defendant Davis is a citizen of Ohio.

24.     Defendant Mark P. Frissora ("Frissora") is a Walgreens director and has been since January 2009. Defendant Frissora is also Chairman of Walgreens' Finance Committee and has been since at least November 2011. Defendant Frissora knowingly or recklessly failed to ensure timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated. Defendant Frissora also knowingly or recklessly made misleading statements in the Company's SEC filings concerning Walgreens' ineffective internal controls. Walgreens paid defendant Frissora the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $105,000 | $175,024 | $280,024 |
| 2013 | $100,000 | $170,010 | $270,010 |
| 2012 | $100,000 | $154,988 | $254,988 |

Defendant Frissora is a citizen of Florida.

25.     Defendant Ginger L. Graham ("Graham") is a Walgreens director and has been since May 2010. Defendant Graham is also a member of Walgreens' Finance Committee and has been since at least November 2011. Defendant Graham knowingly or recklessly failed to ensure

timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated. Defendant Graham also knowingly or recklessly made misleading statements in the Company's SEC filings concerning Walgreens' ineffective internal controls. Walgreens paid defendant Graham the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $85,000 | $175,024 | $18,428 | $278,452 |
| 2013 | $80,000 | $170,010 | $12,051 | $262,061 |
| 2012 | $80,000 | $154,988 | $5,349 | $240,337 |

Defendant Graham is a citizen of Colorado.

26. Defendant David J. Brailer ("Brailer") is a Walgreens director and has been since October 2010. Defendant Brailer is a member of Walgreens' Audit Committee and Finance Committee and has been since December 2010. Defendant Brailer knowingly or recklessly failed to ensure timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated. Defendant Brailer also knowingly or recklessly made misleading statements in the Company's SEC filings concerning Walgreens' ineffective internal controls. Walgreens paid defendant Brailer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $85,000 | $175,024 | $14,574 | $274,598 |
| 2013 | $80,000 | $170,010 | $6,956 | $256,966 |
| 2012 | $80,000 | $154,988 | $410 | $235,398 |

Defendant Brailer is a citizen of California.

27.     Defendant Dominic P. Murphy ("Murphy") is a Walgreens director and has been since August 2012.  Defendant Murphy is also a member of Walgreens' Finance Committee and has been since October 2012.  Defendant Murphy knowingly or recklessly failed to ensure timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated.   Defendant Murphy also knowingly or recklessly made misleading statements in the Company's SEC filings concerning Walgreens' ineffective internal controls.   Walgreens paid defendant Murphy the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $85,000 | $175,024 | $3,068 | $263,092 |
| 2013 | $60,000 | $28,329 | - | $88,329 |

Defendant Murphy is a citizen of United Kingdom.

28.     Defendant Janice M. Babiak ("Babiak") is a Walgreens director and has been since April 2012.  Defendant Babiak is also Chairman of Walgreens' Audit Committee and has been since January 2013 and a member of that committee and has been since April 2012.  Defendant Babiak is also a member of Walgreens' Finance Committee and has been since April 2012.  Defendant Babiak knowingly or recklessly failed to ensure timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated.  Defendant Babiak also knowingly or recklessly

made misleading statements in the Company's SEC filings concerning Walgreens' ineffective internal controls. Walgreens paid defendant Babiak the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $110,000 | $175,024 | $5,850 | $290,874 |
| 2013 | $95,972 | $84,987 | $1,990 | $182,949 |
| 2012 | $31,522 | - | - | $31,522 |

Defendant Babiak is a citizen of Tennessee.

29.     Defendant Miquelon was Walgreens' CEO from June 2008 to August 2014; an Executive Vice President from July 2009 to August 2014; and President, International from October 2012 to August 2014. Defendant Miquelon was also a Walgreens Senior Vice President from June 2008 to July 2009. Defendant Miquelon continued in a non-executive role at Walgreens until December 2014. Defendant Miquelon knowingly, recklessly, or with gross negligence failed to ensure timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated. Defendant Miquelon also knowingly, recklessly, or with gross negligence made misleading statements in the Company's SEC filings concerning Walgreens' ineffective internal controls. Walgreens paid defendant Miquelon the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2014 | $795,833 | $2,196,331 | $1,059,908 | $617,566 | $13,156 | $336,738 | $5,019,532 |
| 2013 | $771,167 | $1,720,330 | $678,215 | $902,265 | $23,147 | $232,143 | $4,327,267 |
| 2012 | $750,333 | $1,209,426 | $502,343 | $415,534 | $20,948 | $277,228 | $3,175,812 |

Defendant Miquelon is a citizen of Illinois.

30. Defendant David Y. Schwartz ("Schwartz") was a Walgreens director from January 2000 to January 2013. Defendant Schwartz was also Chairman of Walgreens' Audit Committee and a member of the Finance Committee from at least November 2011 to January 2013. Defendant Schwartz knowingly or recklessly failed to ensure timely disclosures that: (i) generic drug prices were skyrocketing; (ii) the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in financial risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated. Walgreens paid defendant Schwartz the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2013 | $37,917 | $170,010 | $20,377 | $228,304 |
| 2012 | $105,000 | $154,988 | $29,473 | $289,461 |

Defendant Schwartz is a citizen of Illinois.

31. The defendants identified in ¶¶16, 29 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶16-28, 30 are referred to herein as the "Director Defendants." The defendants identified in ¶¶17, 21-22, 26, 28, 30 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶16-30 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

32. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Walgreens and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Walgreens in a fair, just, honest, and equitable manner. The Individual

Defendants were and are required to act in furtherance of the best interests of Walgreens and not in furtherance of their personal interest or benefit.

33.     To discharge their duties, the officers and directors of Walgreens were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Walgreens were required to, among other things:

(a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(c)     remain informed as to how Walgreens conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

34.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Walgreens, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

35.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its business prospects.  These improper practices wasted the Company's assets, and caused Walgreens to incur substantial damage.

36.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Walgreens, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Walgreens has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

37.     In addition to these duties, under its Charter in effect since at least July 2013, the Audit Committee Defendants, defendants Babiak, Brailer, Schlichting, Schwartz, Silva, and Skinner, owed specific duties to Walgreens to assist the Board in overseeing the integrity of the Company's financial statements and its financial reporting process, as well as the soundness of the Company's systems of internal accounting and financial controls.  Moreover the Audit Committee's Charter provides that the Audit Committee has specific duties to, among other things:

(a)     "Review and discuss with management and the independent auditor the annual audited financial statements and quarterly financial statements, including disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations' prior to filing with the SEC or distribution to shareholders and the public."

(b)     "Discuss generally the types of information to be disclosed and the type of presentation to be made with respect to earnings press releases, as well as financial information and earnings guidance, if any, provided to analysts and rating agencies."

(c)     "Discuss policies and procedures with respect to enterprise risk assessment and risk management. In addition, as delegated by the full Board, review key enterprise risks on a quarterly basis, and discuss with management the steps taken to monitor and control such risks."

(d)     "Periodically review the adequacy and effectiveness of the Company's disclosure controls and procedures and the Company's controls over financial reporting, including any significant deficiencies or material weaknesses and significant changes in internal controls."

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Walgreens, regarding the Individual Defendants' management of Walgreens' operations; and (ii) enhance the Individual Defendants' executive and directorial positions at Walgreens and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course

of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

40.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

41.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

42.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**WALGREENS ENTERS INTO A TRANSACTION WITH ALLIANCE BOOTS AND ANNOUNCES ITS EXPECTED FINANCIAL RESULTS FOR THE FIRST YEAR AFTER THE COMPANIES' COMBINATION**

44.     On June 19, 2012, Walgreens announced that it formed a strategic partnership with Alliance Boots.  The strategic partnership called for Walgreens to acquire a 45% stake in Alliance Boots for $6.7 billion in cash and stock.[2]  Walgreens also procured the option to acquire the remaining 55% of Alliance Boots during the six-month period beginning two and a half years after the initial closing pursuant to the Second Step Acquisition.

45.     Although the Company did not have to exercise its option to engage in the Second Step Acquisition, the Individual Defendants always envisioned that Walgreens would complete the acquisition of Alliance Boots.  Indeed, according to the June press release, the transaction was structured as two steps "to allow synergies to be realized by the respective management teams working closely together on key projects, while progressing to full integration in approximately three years' time."   In August 2012, after the First Step Acquisition closed, the Company, working closely with Alliance Boots, initiated a set of goals for FY 2016, which was anticipated to be the first full fiscal year of operation as a combined company.  These publicly announced FY 2016 goals included, among other things, $9 billion to $9.5 billion in adjusted EBIT.

---

[2] At the time of the First Step Acquisition, Alliance Boots was owned by defendant Pessina and global private equity firm Kohlberg Kravis Roberts & Co. L.P. ("KKR").  Upon consummation of the First Step Acquisition, defendant Pessina and defendant Murphy, a KKR partner, joined the Board of Walgreens.

**THE INDIVIDUAL DEFENDANTS REPEATEDLY ISSUE MISLEADING
STATEMENTS DESPITE INTERNAL EBIT FORECASTS PLUMMETING**

46.     In the second half of 2013, the cost of generic drugs began to skyrocket.  Indeed,

according to the NCPA, by January 2014, pharmacy acquisition prices for many essential generic

drugs increased "by as much as 600%, 1,000% or more, according to a survey of more than

1,000 community pharmacists."  The exploding costs of generic drugs were widely reported in

numerous media outlets throughout 2014, including *Time Magazine* and *Bloomberg*, among

others.

47.     The increase in the cost of generic drugs is a particularly large problem for

Walgreen because of its arrangements with the entities that actually pay for most of the costs for

drugs purchased from the Company.  Walgreen enters into agreements with third-party payers,

such as employers, governments, managed care organizations and pharmacy benefit managers,

that offer only limited ability to adjust the final price of drugs.  As the Company admits in its

most recent Form 10-k, "[o]ur existing reimbursement arrangements with payers generally

provide us with only limited protection against cost increases in our generic drug procurement

costs."  Accordingly, a substantial increase in generic drug prices cannot be passed onto the

Company's customers and therefore decreases Walgreens margins and EBIT.

48.     Nevertheless, as generic drug prices continued to soar, the Company continued to

assert that it was on track to meet its FY 2016 goals.  As detailed in the Miquelon Complaint,

however, internal EBIT forecasts first began to drop in July 2013 and continued to spiral

downward thereafter.

49.     The Miquelon Complaint reveals that in July 2013, as part of the Company's

Board-approved Long Range Plan ("LRP") review, the EBIT forecast was first internally

lowered to $8.7 billion.  Nonetheless, on October 1, 2013, during the Company's fourth quarter

2013 earnings conference call, defendant Miquelon boasted to investors that Walgreens expected "$9 billion to $9.5 billion of combined adjusted [first in, first out ("FIFO")] operating income."

50.     Shortly after defendant Miquelon touted the Company's EBIT forecast, on October 21, 2013, Walgreens filed its Annual Report on Form 10-K with the SEC for the period ended August 31, 2013.   The Form 10-K misleadingly stated that the Company's disclosure controls and procedures were effective.   The Form 10-K, was signed by defendants Miquelon, Wasson, Pessina, Skinner, Babiak, Brailer, Davis, Foote, Frissora, Graham, McNally, Murphy, Schlichting, and Silva, and stated, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Management conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this Form 10-K. The controls evaluation was conducted under the supervision and with the participation of the Company's management, including its Chief Executive Officer (CEO) and Chief Financial Officer (CFO). Based upon the controls evaluation, our CEO and CFO have concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified by the SEC, and that such information is accumulated and communicated to management, including the CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.

51.     As disclosed in the Miquelon Complaint, by "late 2013," an additional $200-300 million of risk in the FY 2016 EBIT goal was identified and brought to the Board's attention by defendants Wasson and Miquelon.   This additional risk brought the EBIT forecast down to approximately $8.5 billion.   At the time, defendant Miquelon and his team identified the largest source of this risk as the unprecedented level of inflation in the price of generic drugs that both Walgreens and the industry were experiencing.

52.     On November 12, 2013, Walgreens gave a presentation at the 2013 Credit Suisse Annual Healthcare Conference.   During the conference, and in contrast to internal reports to the

Board, defendant Miquelon reiterated that Walgreens "put an EBIT goal of $9 billion to $9.5 billion FIFO with adjusted EBIT out there," while again failing to disclose that internally the Company only expected to achieve $8.5 billion at that time.

53.     On November 20, 2013, Walgreens presented at Morgan Stanley's Global Consumer & Retail Conference.  During the presentation, defendant Miquelon boasted that the Company was "in a good stead" to achieve its 2016 goals, and that "[the Company's] goals are to have a combined EBIT of over $9 billion on a FIFO-adjusted basis."

54.     On a December 20, 2013 earnings call, with highly tempered language, defendant Miquelon publicly admitted for the first time that Walgreens' performance with respect to the EBIT goal of $9 billion to $9.5 billion was tracking "a bit below" the compound annual growth rate ("CAGR") required to meet the goal.  Defendant Miquelon failed to disclose, however, that the Company had already identified a half a billion to a billion dollars in shortfalls which brought the internal EBIT estimates down to $8.5 billion.  Further, defendant Miquelon failed to disclose that generic drug price inflation was a substantial contributing factor to the shortfall, and instead vaguely blamed "gross profit dollar growth pressure domestically" and "a challenging environment in some international markets."  Nonetheless, defendant Miquelon assured investors that Walgreens "remain[ed] focused on delivering [the $9 billion to $9.5 billion EBIT goal]."

55.     On December 27, 2013, seven days after defendant Miquelon boasted that the Company was focused on delivering the long touted EBIT goal, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended November 30, 2013.  The Form 10-Q again misleadingly assured investors that Walgreens' disclosure controls and procedures were effective.  The Form 10-Q, which was signed by defendant Miquelon, contained substantially similar language to the October 21, 2013, Form 10-K, as detailed above.

56.     On January 8, 2014, during a Walgreens shareholder/analyst call, defendant Miquelon again discussed the Company's 2016 goals and again failed to disclose the true shortfalls that were expected or the actual reasons for such shortfalls.  In particular, defendant Miquelon stated that "[p]erformance to date with respect to our adjusted operating income goal of $9 [billion] to $9.5 [billion] is tracking currently *a little bit below* the compound average growth rate required to achieve the goal, largely because there's some gross profit pressures mentioned previously and a challenging environment in some international markets."  Defendant Miquelon nonetheless assured investors that Walgreens "remain[ed] focused on delivering [the EBIT goal]," and that the Company "continue[d] to be very, very excited about [its] future and the value that [Walgreens] can create."

57.     On January 15, 2014, Walgreens presented at the JPMorgan 32nd Annual Healthcare Conference.  During the presentation, defendant Wasson noted that the EBIT goal of $9 billion to $9.5 billion was "tracking below the CAGR required to achieve th[e] goal," but stressed that Walgreens "remain[ed] focused on delivering [the goal]."

58.     According to the Miquelon Complaint, by March 2014, it was well known that Walgreens would fall far short of the $9 billion to $9.5 billion EBIT goal.  Not only was Alliance Boots underperforming on a U.S. Generally Accepted Accounting Principles ("GAAP") adjusted EBIT basis, "it was becoming increasingly clear that the deflation in pricing of generic drugs that had been the trend over the last decade may have systematically reverted to an inflationary trend."  In addition, at about the same time, "Walgreens' pricing and contracting group, which reported directly to Kermit Crawford, who in turn reported to [defendant] Wasson, was having a very difficult time negotiating with a certain group of payors."  Nonetheless, on the Company's

March 25, 2014 earnings call, defendant Miquelon again assured investors that the Company "remain[ed] focused on delivering [the $9 billion to $9.5 billion EBIT goal]."

59.     Two days later, on March 27, 2014, Walgreens' filed its Quarterly Report on Form 10-Q with the SEC for the period ended February 28, 2014, reiterating that the Company's disclosure controls and procedures were purportedly effective.  The Form 10-Q was signed by defendant Miquelon and contained substantially similar language to the October 21, 2013 Form 10-K and the December 27, 2013 Form 10-Q, as detailed above.

60.     The Miquelon Complaint further disclosed that in April 2014, an interim LRP update was shared with the Board.  At the meeting, the Board learned that the previously estimated yet undisclosed $8.5 billion[3] FY 2016 EBIT outlook was substantially higher than the Company was likely to achieve.  In particular, the Board was informed through various presentations of "***an additional risk well in excess of $1 billion***, primarily based on third party reimbursement negotiations (including Medicare Part D contracts), continued unprecedented inflation in the price of generic drugs, and underperformance of Alliance Boots."

61.     By late May or early June 2014, defendant Miquelon and his finance team determined that the FY 2016 EBIT number was tracking in the range of $7.2-7.5 billion, over $2 billion (or 24%) short of high end of the long-stated goal.  The finance team also predicted an earnings per share ("EPS") figure in the range of $4.25 to $4.60.  Shockingly, on several occasions in June 2014, according to defendant Miquelon, defendant Wasson pressured him to raise the EPS estimate to at least $6 per share.  Defendant Wasson also argued for delaying disclosure of the Company's EBIT shortfall until July 10, 2014, so that the news could be

---

[3] The $8.5 billion figure consists of the $8.7 billion forecast that was set in July 2013 less the $200-300 million in additional undisclosed risk identified in late 2013.

"bundled" with other, more positive developments relating to the progress on the Second Step Acquisition.

## THE TRUTH IS SLOWLY REVEALED

62.     On June 24, 2014, during the Company's third quarter 2014 earnings conference call, defendant Wasson noted that Walgreens withdrew its FY 2016 goals and finally admitted that the Company no longer expected to achieve the EBIT goal of $9 billion to $9.5 billion. Defendant Wasson gave no indication of the drastic nature of the shortfall, the devastating effects of skyrocketing generic drug procurement costs, or the Company's continuing struggles with third-party reimbursement negotiations.  Defendant Wasson stated, in relevant part:

> One final note. As a result of the many Step 2 considerations and current business performance, the company is withdrawing its fiscal year 2016 goals that were previously announced in 2012. The company expects to provide a new set of goals and metrics for the proposed combined enterprise for fiscal 2016, and we will communicate those to you on our call, which we expect to hold in late July or early August.
>
> Let me speak directly to 2 of the prior goals. Regarding our adjusted operating income goal of $9 billion to $9.5 billion, on previous calls, we noted we were tracking below the CAGR required to meet the goal. We now no longer expect to reach that goal. On our combined synergy goals I noted earlier, we are tracking ahead of the -- of that goal and we expect to exceed the $1 billion amount by the end of fiscal 2016. As noted above, some of the opportunities we are pursuing are below the operating line -- income line on the income statement and decisions about those will be reflected in our new goals and metrics.

63.     On July 1, 2014, Walgreens' filed its Quarterly Report on Form 10-Q with the SEC for the period ended May 31, 2014, reiterating that the Company's disclosure controls and procedures were purportedly effective.  The Form 10-Q was signed by defendant Miquelon and contained substantially similar language to the October 21, 2013 Form 10-K and the December 27, 2013 and March 27, 2014 Forms 10-Q.

64.     On August 4, 2014, Walgreens announced that defendant Miquelon resigned from each of his positions with the Company effective that day.  Defendant Miquelon agreed to serve as an advisor to Walgreens until December 2014.

65.     On August 6, 2014, Walgreens issued a press release to provide an update on the Company's 2016 goals.  In the press release, the Company finally disclosed the full extent of the Company's shortfall.  With respect to the EBIT goal, defendant Wasson announced the same day on a conference call that Walgreens expected "an adjusted EBIT range with mid-point around $7.2 billion," a over two billion dollars (24%) less than the high end of the $9 to $9.5 billion range that the Individual Defendants repeatedly claimed Walgreens was "focused on delivering." The press release also disclosed that Walgreens had entered into an agreement with Alliance Boots to accelerate the Second Step Acquisition and exercise the Company's option to acquire the remainder of Alliance Boots that Walgreens does not already own.  The combined WBA global enterprise would be domiciled in the United States, rather than overseas as some investors expected.  Finally, the press release announced that the Company would be reducing its 2016 forecasted pharmacy unit earnings by $1.1 billion, in part because of a step-down of reimbursements via the federal Medicare Part D program.

66.     On August 19, 2014, *The Wall Street Journal* published an article titled "Walgreens Shakeup Followed Bad Projection."  According to the article, after the Company withdrew its forecast, Walgreens directors privately disclosed to certain of the Company's largest investors that the Board was purportedly unaware the Company's forecasting change was coming.  Further, according to certain investors that met with various members of the Board, the Company's directors blamed the missed forecast on the fact that Walgreens' finance and pharmacy units purportedly were not "talking to each other."

67.    In contrast to *The Wall Street Journal* article, the Miquelon Complaint, which was filed on October 16, 2014, alleges that Walgreens' Board was complacent in allowing certain activist investors to pressure management to raise its earnings forecast for the FY 2016, and that defendant Pessina improperly met directly with certain large Walgreens shareholders to discuss the future of the Company.  As detailed herein, the Miquelon Complaint also alleges that defendants Wasson and Pessina improperly interfered with the Company's financial reporting process.  Like *The Wall Street Journal* article, however, the Miquelon Complaint alleges that defendants Wasson and Pessina disclosed to certain of the Company's investors that Walgreens' "Finance Team was 'weak' and the Company had 'lax internal controls.'"  In any event, whether the Board was unaware of internal forecasting, as suggested by *The Wall Street Journal* investigation and the statements by defendants Wasson and Pessina, or actively sought to tamper with earnings forecasts, as suggested by the Miquelon Complaint, it is clear that the Company's internal controls were inadequate to ensure proper financial reporting at the Company.

68.    On October 20, 2014, Walgreens filed its Annual Report on Form 10-K with the SEC for the period ended August 31, 2014.  In stark contrast to the statements made by defendants Wasson and Pessina concerning the Company's "lax internal controls," the Form 10-K brazenly assured investors that the Company's disclosure controls and procedures were purportedly effective.  The Form 10-K, which was signed by defendants Wasson, Pessina, Skinner, Babiak, Brailer, Davis, Foote, Frissora, Graham, McNally, Murphy, Schlichting, and Silva, contained substantially similar language to the October 21, 2013 Form 10-K, and the December 27, 2013, March 27, 2014, and July 1, 2014 Forms 10-Q.

69.    In connection with the Second Step Acquisition, on September 16, 2014, WBA filed a registration statement on Form S-4 with the SEC, which was subsequently amended on

October 29, 2014 and November 18, 2014 (as amended, the "S-4"). On November 24, 2014, Walgreens filed with the SEC a proxy statement/prospectus on Schedule 14A (the "Proxy"). The S-4 and the Proxy were issued in connection with Walgreens' solicitation of shareholder support for: (i) the issuance of Walgreens stock to defendant Pessina and KKR in connection with the Second Step Acquisition; and (ii) the Reorganization, at the upcoming special meeting of Walgreens shareholders scheduled for December 29, 2014. The Proxy and the S-4 do not address any of the allegations that were raised in the Miquelon Complaint.

70. On December 10, 2014, the Company filed a Current Report on Form 8-K with the SEC announcing that defendant Wasson would be stepping down as the Company's CEO following the close of the Second Step Acquisition, and that defendant Pessina would be taking his place as acting CEO.

## REASONS THE STATEMENTS WERE IMPROPER

71. The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a) that generic drug prices were skyrocketing;

(b) that the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program;

(c) that the Company had identified billions of dollars in undisclosed risks;

(d) the Company's internal controls over financial accounting and reporting to the public were deficient; and

(e) as a result of the foregoing, the Individual Defendants' representations concerning the Company's 2016 forecast were improper.

## DAMAGES TO WALGREENS

72.     As a result of the Individual Defendants' improprieties, Walgreens disseminated improper, public statements concerning the Company's EBIT forecast and the Company's continuing struggles with skyrocketing generic drug prices.  These improper statements have devastated Walgreens' credibility as reflected by the Company's almost $9.5 billion, or 14.3%, market capitalization loss.

73.     Walgreens' performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Walgreens' current and potential customers consider a company's ability to accurately value its business prospects and adequately identify risks.  Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions.  Walgreens' ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

74.     Further, as a direct and proximate result of the Individual Defendants' actions, Walgreens has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement or judgment in the class actions for violations of federal securities laws;

(b)     costs incurred from defending and paying any settlement or judgment in the defamation action brought by defendant Miquelon;

- 31 -

(c)     costs incurred from paying defendants Wesson and Miquelon severance despite their breaches of fiduciary duty; and

(d)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Walgreens.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

75.     Plaintiff brings this action derivatively in the right and for the benefit of Walgreens to redress injuries suffered, and to be suffered, by Walgreens as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Walgreens is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

76.     Plaintiff will adequately and fairly represent the interests of Walgreens in enforcing and prosecuting its rights.

77.     Plaintiff was a shareholder of Walgreens at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Walgreens shareholder.

78.     The current Board of Walgreens consists of the following fourteen individuals: defendants Wasson, Pessina, Skinner, Foote, McNally, Schlicting, Silva, Davis, Frissora, Graham, Brailer, Murphy, and Babiak and non-defendant Barry Rosenstein.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Wasson, Pessina, Skinner, Foote, McNally, Schlicting, Silva, Davis, Frissora, Graham, Brailer, Murphy, and Babiak Face a Substantial Likelihood of Liability for Their Misconduct**

79.     As alleged above, defendants Wasson, Pessina, Skinner, Foote, McNally,

Schlicting, Silva, Davis, Frissora, Graham, Brailer, Murphy, and Babiak breached their fiduciary duties of loyalty by causing or allowing the Company's fiduciaries to make improper statements in the Company's press releases and SEC filings regarding Walgreens' 2016 forecasts. As revealed by the Miquelon complaint, Miquelon and Wasson specifically told defendants Pessina, Skinner, Foote, McNally, Schlicting, Silva, Davis, Frissora, Graham, Brailer, Murphy, and Babiak that that generic drug prices were skyrocketing, that the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program, and that the Company had identified billions of dollars in undisclosed risks. Despite their knowledge, these defendants repeatedly caused or allowed the Company's fiduciaries to tout that Walgreens was on track to achieve an EBIT of $9 billion to $9.5 billion in 2016, and that the Company remained focused on delivering that goal, despite being in possession of internal forecasts of significantly lower amounts. These defendants also each signed SEC filings that misleadingly stated that the Company's disclosure controls and procedures were effective. These improper statements were made both before and after defendants Wasson and Pessina privately disclosed to investors that Walgreens finance department was "weak" and the Company had "lax internal controls." Each of the defendant directors of Walgreens authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein. Thus, defendants Wasson, Pessina, Skinner, Foote, McNally, Schlicting, Silva, Davis, Frissora, Graham, Brailer, Murphy, and Babiak face a substantial likelihood of liability for their breach of fiduciary duties rendering any demand upon them futile.

80. Defendants Wasson, Pessina, Skinner, Foote, McNally, Schlicting, Silva, Davis, Frissora, Graham, Brailer, Murphy, and Babiak also breached their duty of loyalty by failing to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures, and failed to prevent the other Individual Defendants from committing this wrongdoing.

81. Defendants Babiak, Brailer, Schlichting, Schwartz, Silva, and Skinner, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

82. The acts complained of constitute violations of the fiduciary duties owed by Walgreens' officers and directors and these acts are incapable of ratification.

83. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Walgreens for any of the wrongdoing alleged by plaintiff herein.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     The Individual Defendants owed and owe Walgreens fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Walgreens the highest obligation of good faith, fair dealing, loyalty, and due care.

86.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Walgreens, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

87.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) generic drug prices were skyrocketing; (ii) that the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in undisclosed risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

88.     The Director Defendants, as directors of the Company, owed Walgreens the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein.  The Director Defendants knew or were reckless in not

knowing that: (i) generic drug prices were skyrocketing; (ii) that the Company was experiencing a severe step-down of reimbursements via the federal Medicare Part D program; (iii) the Company had identified billions of dollars in undisclosed risks; and (iv) the Company's stated goal of $9 billion to $9.5 billion in EBIT for 2016 was grossly overstated. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

89.     The Audit Committee Defendants, Babiak, Brailer, Schlichting, Schwartz, Silva, and Skinner, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and defendants Babiak, Brailer, Schlichting, Schwartz, Silva, and Skinner failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

90.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Walgreens has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

91.     Plaintiff, on behalf of Walgreens, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

92.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

93.     As a result of the wrongdoing detailed herein, including by failing to conduct proper supervision, the Individual Defendants have caused Walgreens to waste its assets by

paying improper severance, compensation, and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

94.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

95.     Plaintiff, on behalf of Walgreens, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Unjust Enrichment**

96.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Walgreens.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Walgreens.

98.     Plaintiff, as a shareholder and representative of Walgreens, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

99.     Plaintiff, on behalf of Walgreens, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Walgreens, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Directing Walgreens to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Walgreens and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.     a proposal to strengthen the Company's controls over financial reporting;

2.     a proposal to strengthen Walgreens' oversight of its disclosure procedures;

3.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

4.     a provision to permit the shareholders of Walgreens to nominate at least three candidates for election to the Board;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Walgreens has an effective remedy;

D.     Awarding to Walgreens restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants.

     E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

     F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

     Plaintiff demands a trial by jury.

Date: December 29, 2014

                                         LASKY & RIFKIND, LTD.

                                              /s/ Norman Rifkind_____

                                       Norman Rifkind
                                       Amelia S. Newton
                                       351 W. Hubbard Street, Suite 401
                                       Chicago, IL 60654
                                       Telephone: (312) 634-0057
                                       Facsimile: (847) 835-2374
                                       rifkind@laskyrifkind.com
                                       newton@laskyrifkind.com

                                     *Local Counsel for Plaintiff*

                                     ROBBINS ARROYO LLP
                                     BRIAN J. ROBBINS
                                     KEVIN A. SEELY
                                     ASHLEY R. PALMER
                                     LEONID KANDINOV
                                     600 B Street, Suite 1900
                                     San Diego, CA 92101
                                     Telephone: (619) 525-3990
                                     Facsimile: (619) 525-3991
                                     brobbins@robbinsarroyo.com

                                     VITA LAW OFFICES P.C.
                                     RICHARD J. VITA
                                     100 State Street, 9th Floor
                                     Boston, MA 02109
                                     Telephone: (617) 426-6566
                                     Facsimile: (617) 249-2119
                                     rjv@vitalaw.com

                                     *Attorneys for Plaintiff*

1001575

VERIFICATION

I, Anne Cutler, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _12/22/14_

_Anne Cutler_
ANNE CUTLER