**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| ANNE CUTLER, Derivatively on Behalf of WALGREEN CO., | Case No. 1:14-cv-10408 |
| Plaintiff, | Honorable Rebecca R. Pallmeyer |
| v. | |
| GREGORY D. WASSON, JAMES A. SKINNER, WILLIAM C. FOOTE, STEFANO PESSINA, ALAN G. MCNALLY, NANCY M. SCHLICHTING, ALEJANDRO SILVA, STEPHEN A. DAVIS, MARK P. FRISSORA, GINGER L. GRAHAM, DAVID J. BRAILER, DOMINIC P. MURPHY, JANICE M. BABIAK, WADE D. MIQUELON, and DAVID Y. SCHWARTZ, | |
| Defendants, | |
| and | |
| WALGREEN CO., an Illinois corporation, | |
| Nominal Defendant. | |

**MEMORANDUM IN SUPPORT OF THE**
**RULE 23.1 MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................4

    **A.**     The Alliance Boots Merger. ..................................................................6

    **B.**     The Announcement Of The EBIT Goal.................................................7

    **C.**     The Continued Evaluation Of The EBIT Goal. ....................................7

    **D.**     The Withdrawal Of The EBIT Goal. ....................................................9

ARGUMENT......................................................................................................................10

**I.**     The Complaint Should Be Dismissed Because Plaintiff's Failure To Make A Pre-Suit Demand Was Not Excused....................................................................10

    **A.**     The Complaint Must Be Dismissed Unless It Alleges Particularized Facts Establishing That Demand Would Have Been Futile............................11

    **B.**     To Plead Demand Futility, The Complaint Must Allege Particularized Facts Establishing That A Majority Of The Board Faces A Substantial Likelihood Of Liability........................................................12

    **C.**     The Complaint Fails To Allege Particularized Facts Establishing That A Majority Of The Board Faces A Substantial Likelihood Of Liability...........................................................................................................13

        **1.**     The Complaint's Allegations Regarding The EBIT Goal Statements Do Not Establish That A Majority Of The Board Faces A Substantial Likelihood Of Liability. .......................................14

        **2.**     The Complaint's Allegations Regarding The Internal Controls Statements Do Not Establish That A Majority Of The Board Faces A Substantial Likelihood Of Liability. .......................................19

        **3.**     The Complaint's Allegations Regarding Speculative Damages To Walgreens Do Not Establish That A Majority Of The Board Faces A Substantial Likelihood Of Liability. .......................................21

**II.**     The Complaint Should Also Be Dismissed Because Plaintiff Is No Longer A Walgreen Co. Shareholder Following the Merger With Alliance Boots....................23

CONCLUSION ..................................................................................................................25

# TABLE OF AUTHORITIES

CASES                                                                           **Page(s)**

*Aronson v. Lewis,*
   473 A.2d 805 (Del. 1984) ..............................................................................12, 24

*Bronstein v. Austin,*
   2008 WL 4735230 (N.D. Ill. May 30, 2008) ..................................................12, 21

*Desimone v. Barrows,*
   924 A.2d 908 (Del. Ch. 2007)................................................................................20

*Garza v. Belton,*
   2010 WL 3324881 (N.D. Ill. Aug. 13, 2010) ........................................................11

*Guttman v. Huang,*
   823 A.2d 492 (Del. Ch. 2003)................................................................13, 14, 19

*Higher Educ. Mgmt. Grp., Inc. v. Mathews,*
   2014 WL 5573325 (Del. Ch. Nov. 3, 2014) ..........................................................12

*In re Abbott Depakote S'holder Deriv. Litig.,*
   909 F. Supp. 2d 984 (N.D. Ill. 2012) ...........................................................7, 13, 16

*In re Burlington Coat Factory Sec. Litig.,*
   114 F.3d 1410 (3d Cir. 1997)................................................................................18

*In re Caremark Int'l Inc. Deriv. Litig.,*
   698 A.2d 959 (Del. Ch. 1996)....................................................................14, 19, 20

*In re China Automotive Sys. Inc. Deriv. Litig.,*
   2013 WL 4672059 (Del. Ch. Aug. 30, 2013) ..................................................13, 14

*In re Citigroup Inc. S'holder Deriv. Litig.,*
   964 A.2d 106 (Del. Ch. 2009)........................................................13, 18, 19, 20

*In re Discover Fin. Servs. Deriv. Litig.,*
   2015 WL 1399282 (N.D. Ill. Mar. 23, 2015).......................................................4, 7

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.,*
   922 F. Supp. 2d 445 (S.D.N.Y. 2013)...............................................................22, 23

*In re Gen. Instrument Corp. Secs. Litig.,*
   2000 WL 1742120 (N.D. Ill. Nov. 22, 2000) ........................................................24

*In re Massey Energy Co.,*
   2011 WL 2176479 (Del. Ch. May 31, 2011)..........................................................24

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) ............................................................................................10

*Kamen v. Kemper Fin. Servs., Inc.*,
    659 F. Supp. 1153 (N.D. Ill. 1987) ...................................................................11

*Kuberski v. O'Rourke*,
    2014 WL 1227630 (N.D. Ill. Mar. 25, 2014) ........................................14, 15, 17

*Lewis v. Anderson*,
    477 A.2d 1040 (Del. 1984) ...............................................................................24

*Lewis v. Ward*,
    852 A.2d 896 (Del. 2004) ..................................................................................24

*Marvin H. Maurras Revocable Trust v. Bronfman*,
    2013 WL 5348357 (N.D. Ill. Sept. 24, 2013) ..............................................19, 20

*Postorivo v. AG Paintball Holdings, Inc.*,
    2008 WL 553205 (Del. Ch. Feb. 29, 2008) .......................................................21

*Powell v. Gant*,
    556 N.E.2d 1241 (Ill. App. Ct. 1990) ................................................................12

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) .............................................................................12, 21

*Sadler v. Retail Props. of Am., Inc.*,
    2014 WL 2598804 (N.D. Ill. June 10, 2014) .....................................................13

*Schnitzer v. O'Connor*,
    653 N.E.2d 825 (Ill. App. Ct. 1995) ..................................................................11

*Seminaris v. Landa*,
    662 A.2d 1350 (Del. Ch. 1995)..........................................................................12

*Sherman v. Ryan*,
    911 N.E.2d 378 (Ill. App. Ct. 2009) ..................................................................11

*Silver v. Allard*,
    16 F. Supp. 2d 966 (N.D. Ill. 1998) ...................................................................11

*South v. Baker*,
    62 A.3d 1 (Del. Ch. 2012).............................................................15, 17, 19, 20

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) ..................................................................... passim

*Weil v. Nw. Indus., Inc.*,
    522 N.E.2d 172 (Ill. App. Ct. 1988) ...................................................24

*Wielgos v. Commonwealth Edison Co.*,
    892 F.2d 509 (7th Cir. 1989) .......................................................18

*Wood v. Baum*,
    953 A.2d 136 (Del. 2008) ...........................................................12

**STATUTES**

805 ILCS 5/8.05(a) ...........................................................................1

15 U.S.C. § 78u–5(c)(1)(A)(i) ...............................................................19

**RULES**

Federal Rule of Civil Procedure 23.1 .............................................1, 7, 11

Nominal Defendant Walgreen Co. (often "Walgreens" or the "Company") and individual defendants Gregory D. Wasson, James A. Skinner, William C. Foote, Stefano Pessina, Alan G. McNally, Nancy M. Schlichting, Alejandro Silva, Steven A. Davis, Mark P. Frissora, Ginger L. Graham, David J. Brailer, Dominic P. Murphy, Janice M. Babiak, and David Y. Schwartz submit this memorandum in support of the Federal Rule of Civil Procedure 23.1 motion to dismiss the Complaint.[1]

## INTRODUCTION

This is a shareholder derivative action in which Plaintiff Anne Cutler seeks to step into Walgreens's shoes and sue certain of the Company's current and former directors and officers, based on allegedly improper public statements regarding the Company's future performance and its internal controls. The Complaint should be dismissed because Plaintiff does not have standing to maintain this action. She did not make the legally required demand on the Company's Board of Directors, and she no longer owns Walgreen Co. shares.

Under Illinois law, a corporation's duly-elected directors—not its shareholders—oversee the company's "business and affairs." *See* 805 ILCS 5/8.05(a). This includes making decisions about whether to bring and maintain litigation on the corporation's behalf. In a derivative suit, a plaintiff seeks to usurp this authority. To prevent abuse of the derivative procedure and protect the directors' statutory prerogative to manage the corporation, Illinois law carefully limits the circumstances in which derivative litigation may be maintained by a shareholder. Plaintiff here has breached two of these limitations.

Most fundamentally, Plaintiff did not make the legally required demand on Walgreen Co.'s Board prior to bringing this derivative lawsuit and was not excused from doing so.

---

[1] Pursuant to the Court's Order dated March 4, 2015, this motion only addresses issues related to Rule 23.1. Walgreens and the individual defendants will move to dismiss the Complaint under Rule 12(b)(6), if necessary, pursuant to a schedule the Court approves.

Plaintiff asserts that a demand would have been futile because a majority of the Board faces a "substantial likelihood" of liability for certain allegedly improper public statements. To demonstrate demand futility on this basis, however, the Complaint must plead particularized facts showing that a majority of the directors who were serving on Walgreens's Board on the date the Complaint was filed actually knew that the challenged statements were improper when they were made, and consciously did nothing in response. The Complaint does not come close to pleading such egregious bad faith.

The statements challenged by Plaintiff related to the Company's goal of achieving $9 to $9.5 billion in EBIT (earnings before interest and tax) in fiscal 2016 (the "EBIT Goal"). The EBIT Goal was one of five long-term financial performance objectives (the "FY16 Goals") announced by Walgreens in June 2012 in conjunction with the first step of the merger between Walgreen Co. and Alliance Boots GmbH ("Alliance Boots"). The FY16 Goals were for financial performance *four years in the future*. The Company made clear, including through its detailed cautionary statements, that the Goals, like all forward-looking statements, were uncertain and subject to numerous risks and opportunities.

As the Complaint acknowledges, during the second half of 2013 and the first part of 2014, the Company faced increasingly challenging economic circumstances in the US and international healthcare markets, including in the form of generic drug price inflation and downward pressure on Medicare Part D reimbursement rates. Over the course of this period, these factors increasingly impacted the Company's anticipated ability to achieve its EBIT Goal for 2016. The Company warned investors in December 2013 that it was not on track to reach the EBIT Goal, and the Company actually withdrew this Goal in June 2014—over two years before

the end of the fiscal year to which it related—once it became clear that the Goal was no longer reasonably attainable.

The crux of Plaintiff's claim is that she believes the Company did not withdraw the EBIT Goal soon enough and that statements about the EBIT Goal from October 2013 through March 2014 were too optimistic. But these were not statements of the Board; they were statements by management. Thus, the purported claim against the directors does not assert direct liability for alleged disclosure violations. Instead, at most it is a claim that the Board failed in its obligation to oversee the activities of management. Such a claim has aptly been described as "'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'" *Stone v. Ritter*, 911 A.2d 362, 372 (Del. 2006). And for purposes of establishing that a demand would be futile, Plaintiff must do more than merely assert the *possibility* that this claim might be successful or would survive a motion to dismiss. Instead, Plaintiff must allege "particularized facts" that a majority of the Board faces a "substantial likelihood" of personal financial exposure on the claim. She fails to do so. The Complaint pleads no particularized facts establishing that a majority of the Board actually knew at the time of the challenged statements that the EBIT Goal was so certain to be missed that it should have been withdrawn even earlier. The Complaint's tag-along internal controls claim similarly fails for want of particularized facts showing Board knowledge of any alleged issues with the controls.

Plaintiff's inability to establish demand futility is not surprising. There is no plausible reason why the distinguished professionals on Walgreens's Board would risk their reputations and livelihoods by knowingly permitting improper public statements about the EBIT Goal. The Board does not face a substantial likelihood of liability for intentional wrongdoing, so demand was required. It was not made. Therefore, the Complaint should be dismissed.

Plaintiff also lacks standing because she is no longer a shareholder of Walgreen Co. As a result of the December 31, 2014, completion of the Alliance Boots merger, Plaintiff's Walgreen Co. shares were converted to shares in Walgreens Boots Alliance, Inc. ("WBA"), a newly formed parent company. The law is clear: when a plaintiff's shares are eliminated by a merger, she loses standing to pursue derivative litigation on behalf of that corporation. Thus, separate and apart from her failure to make a demand, Plaintiff may no longer attempt to step into Walgreen Co.'s shoes. If Plaintiff wishes to pursue the purported claims, she must make a demand on the WBA Board, which she has not done. The Complaint should be dismissed for this reason as well.

## FACTUAL BACKGROUND

Walgreens was founded in 1901 in Chicago, Illinois. It is the largest drugstore chain in the US, with fiscal 2014 net sales of $76.4 billion. (Walgreens 2014 Form 10-K at 4.[2]) Walgreens operates more than 8,300 retail locations in the US, the vast majority of which contain pharmacies, and it employs approximately 251,000 people. (*Id.* at 4, 8.) Walgreens serves more than 6 million customers every day, and it filled almost 700 million prescriptions last year. (*Id.* at 4, 6.)

Walgreens's Board on the date the Complaint was filed was composed of the following fourteen individuals:

- *Gregory D. Wasson* was Walgreens's President and CEO, as well as a director, prior to his retirement in 2015. He is on the boards of AmerisourceBergen Corp. and Verizon Communications Inc.

---

[2] Walgreens's public filings are available at http://investor.walgreensbootsalliance.com/sec.cfm. The Court may take notice of the sources cited in this memorandum because they are public records. *See In re Discover Fin. Servs. Deriv. Litig.*, 2015 WL 1399282, at *2 n.3 (N.D. Ill. Mar. 23, 2015).

- *James A. Skinner* is Executive Chairman of the Board. He was formerly the Vice Chairman and CEO of McDonald's Corporation. He serves on the boards of Ronald McDonald House Charities, Illinois Tool Works, and Hewlett Packard.

- *Janice M. Babiak* is a former managing partner at Ernst & Young LLP. She is a CPA in the US and a chartered accountant in the UK. She serves on the boards of the Royal Mail Group and the Bank of Montreal.

- *David J. Brailer, MD* was appointed by President Bush as the first National Health Information Technology Coordinator. He taught at the University of Pennsylvania School of Medicine and The Wharton School of Business.

- *Steven A. Davis* is the Chairman and CEO of Bob Evans Farms, Inc. He serves on the boards of Marathon Petroleum Corporation, the Arthur G. James Cancer Hospital, and the Richard J. Solove Research Institute Foundation.

- *William C. Foote* was the Chairman and CEO of USG Corporation. He is the former chairman of the board of the Federal Reserve Bank of Chicago and a life trustee of Northwestern Memorial Hospital.

- *Mark P. Frissora* is the CEO-designate of Caesars Entertainment Corp. He was the Chairman and CEO of Hertz Global Holdings, Inc. He is on the board of Delphi Holdings LLP and serves on McKinsey's CEO Advisory Council.

- *Ginger L. Graham* is the President and CEO of Two Trees Consulting, Inc. She was the President and CEO of Amylin Pharmaceuticals, and serves as a director of the Circle of Life Hospice Foundation.

- *Alan G. McNally* was the Chairman of Walgreens from 2008 to 2012 and its acting CEO from October 2008 to February 2009. He was the CEO of Harris Bank and Chairman of Harris Financial Corporation.

- *Dominic Murphy* is a partner of Kohlberg Kravis Roberts & Co. L.L.P. and is on the boards of Acteon and Ambea. He also serves as a member of the Great Ormond Street Hospital Children's Charity Corporate Partnerships Board.

- *Stefano Pessina* is the acting CEO of WBA. He was the Executive Chairman of Alliance Boots and serves on the board of Galenica AG.

- *Barry Rosenstein* is the founder and managing partner of JANA Partners, LLC. He is a trustee of Brown University, the US Olympic Foundation, and the 92nd Street Y in New York City.[3]

---

[3] Plaintiff did not name Rosenstein as a defendant.

- *Nancy M. Schlichting* is the CEO and a director of the Henry Ford Health System. She is on the board of the Federal Reserve Bank of Chicago—Detroit Branch and the Duke University Sanford School of Public Policy Board of Visitors.

- *Alejandro Silva* is the Chairman and CEO of Evans Food Group, Ltd. He serves as a director of PrivateBancorp., Inc., the Chicago Transit Authority, The Field Museum, and the Chicago Symphony.

(*See, e.g.*, Walgreens 2013 Schedule 14A at 7–13.)

### A. The Alliance Boots Merger.

In June 2012, Walgreens announced a strategic transaction with Alliance Boots, a leading international drugstore and pharmaceuticals distribution company. (Walgreens 2014 Form 10-K at 5.) The merger was designed to transform Walgreens from a US-based business into a global pharmacy-led, health and wellbeing enterprise. (*Id.* at 6.) Overall, the deal was valued at approximately $16.2 billion. (Walgreens 6/19/12 Press Release.)

The merger was structured in two steps. In step one, which closed in August 2012, Walgreens obtained 45 percent of Alliance Boots's stock and the option to purchase the remaining 55 percent in the future (step two). (Walgreens 2014 Form 10-K at 4.) This two-step structure allowed the Company to reduce the risk of the transaction by realizing synergies and integrating with Alliance Boots over the course of a few years. (*See* Cmplt. ¶ 45.)

In late 2014, Walgreen Co.'s shareholders voted overwhelmingly to complete step two of the merger. (Walgreens 12/29/14 Press Release.) The long-planned merger closed on December 31, 2014, and Walgreen Co. and Alliance Boots became wholly owned subsidiaries of the new parent company, WBA. (Walgreens 12/31/14 Press Release.) All outstanding shares of Walgreen Co. were automatically converted to shares of WBA. (*Id.*)

### B.     The Announcement Of The EBIT Goal.[4]

As part of the June 2012 announcement of the Alliance Boots merger, Walgreens declared five "goals" for financial performance in fiscal 2016, which would run from September 1, 2015, through August 31, 2016, and would be the first full fiscal year after the merger was completed.  (*See* Cmplt. ¶ 45.)  These five FY16 Goals were:  (i) $9 to $9.5 billion in adjusted operating income, or EBIT; (ii) $130 billion of revenue; (iii) $1 billion in synergies; (iv) $8 billion of operating cash flow; and (v) $11 billion of combined net debt.  (*See* Ex. A, 10/1/13 Earnings Call Tr. 9.[5])  The FY16 Goals were not earnings guidance, *i.e.*, short term financial projections for the next quarter or year of the sort that some public companies issue to investors.  The Company did not provide such guidance to the market.  Rather, the "Goals" were exactly that:  a series of long-range *objectives* or *aspirations* over a multi-year horizon, not precise financial predictions.  Like all long range plans, the Goals were necessarily uncertain and subject to both risks and opportunities—which were repeatedly stressed in the Company's detailed cautionary statements in its SEC filings, and which the Company reiterated with specific regard to the Goals in its public disclosures from December 2013 through March 2014.  (*See, e.g.*, Cmplt. ¶¶ 56–58; *see also, e.g.*, Walgreens 2014 Form 10-K at Item 1A; Ex. B, 12/20/13 Earnings Call Tr. 3, 7.)

### C.     The Continued Evaluation Of The EBIT Goal.

In the second half of 2013, certain of the Company's internal analyses identified the possibility that the Company might fall short of one of the five goals—the EBIT Goal—based on

---

[4] As a matter of law, the well-pleaded facts alleged in the Complaint are presumed to be true for purposes of this Rule 23.1 motion to dismiss, *see In re Abbott Depakote S'holder Deriv. Litig.*, 909 F. Supp. 2d 984, 989 (N.D. Ill. 2012); however, movants do not concede that the Complaint fairly or accurately states the facts.

[5] Each transcript attached as an exhibit to this memorandum is "central to the complaint and [is] referred to in it," and therefore "is properly subject to judicial notice," *In re Discover*, 2015 WL 1399282, at *2 n.3.

then-current performance, and trends and risks that the Company saw carrying forward over the next three years.  (*Cf.* Cmplt. ¶¶ 49, 51.)  A particularly important factor in this potential shortfall was the slowing, and even halt, during this period of the long-running deflationary trend in generic drug prices.  (*Cf. id.* ¶ 46.)  For some drugs, there was meaningful price inflation.  (*Cf. id.*)  This change in market conditions was not anticipated, and it impacted Walgreens's profitability (and thus EBIT) because of limitations on the Company's ability to pass these increased costs on to customers.  (*See id.* ¶ 47.)  By the end of 2013, the Company's internal analyses suggested that it might fall short of the EBIT Goal by 3 to 6 percent, although the Company was on track to meet or exceed the other four FY16 Goals.  (*See id.* ¶¶ 49, 51; Ex. B, 12/20/13 Earnings Call Tr. 7.)

The Company therefore disclosed that it was not on track to reach the EBIT Goal.  On its December 2013 earnings call for the fiscal quarter September through November 2013, the Company said that "[p]erformance to date with respect to our adjusted operating income [EBIT] goal . . . is currently tracking a bit below the CAGR [compound annual growth rate] required to meet this goal."  (Ex. B, 12/20/13 Earnings Call Tr. 7; Cmplt. ¶ 54.)  The Company explained that there were "risks to achieving [the EBIT Goal]" and that it had "identified a range of further opportunities . . . [that could] help mitigate these risks."  (Ex. B, 12/20/13 Earnings Call Tr. 7.)  It also noted that there was "some [generic drug price] inflation in the industry" and observed that it "did see some unusual inflation on select molecules in this past quarter, which did give [it] a little bit of an impact.  It's hard to say whether that will be ongoing or not."  (*Id.* at 14; *see also* Ex. C, 3/25/14 Earnings Call Tr. 7–8 (repeating that the Company was not on track to meet the EBIT Goal).)

### D. The Withdrawal Of The EBIT Goal.

In the first half of 2014, generic drug price inflation escalated, and it became increasingly clear that this inflation was not a short-term divergence but rather a new trend. (*See* Cmplt. ¶ 46 (noting that the "exploding costs of generic drugs were widely reported in numerous media outlets throughout 2014").) Additionally, in the spring of 2014, the Company negotiated reimbursement contracts with various third-party payors regarding Medicare Part D prescription drug plans. The Company faced substantial reimbursement pressure in these contracts, which were finalized around late April 2014. (*See id.* ¶ 60.)

The combination of these two factors, in particular, had a substantial impact on the Company's ability to achieve the EBIT Goal. By early June 2014, the Company's internal analyses suggested that the EBIT Goal was no longer reasonably attainable. (*See id.* ¶ 61.) The Company therefore withdrew the Goal on its next regularly scheduled earnings call, which was on June 24, 2014. (*See id.* ¶ 62.) On that call, the Company discussed generic drug price inflation and reimbursement pressure at length. In particular, the Company noted that it had felt the "full impact" of these factors in the fiscal quarter March through May 2014. (*See* Ex. D, 6/24/14 Earnings Call Tr. 6, 10–18 (explaining that the "primary drivers for the pharmacy margin decrease" that quarter were, inter alia, "increasing third-party reimbursement pressure . . . and pronounced generic drug inflation on a subset of generic drugs"); Cmplt. ¶¶ 7, 62.)

The Company did not provide new FY16 Goals on the June 2014 call. It explained that further analysis was ongoing, and it was making final decisions on matters related to the combined Walgreens–Alliance Boots entity. (*See* Ex. D, 6/24/14 Earnings Call Tr. 7 (noting that the issues being evaluated included "the potential timing and structure, the combined management team, continued synergy and cost reduction initiatives[,] and potential changes to our future capital structure").) Many of these issues were "interdependent, and so [the

Company] believe[d] that the prudent course [wa]s to share the scope of [its] decisions and related financial objectives and metrics together all at [the same] time." (*Id.* at 7–8.) The Company said it intended to schedule another public investor call for late July or early August for these announcements. (*Id.* at 4.)

That call was held on August 6, 2014, and Walgreens announced, among other things, the combined management team for WBA and that it would not undertake a tax inversion in connection with step two of the Alliance Boots merger. (*See* Ex. E, 8/6/14 M&A Call Tr. 3–6; Cmplt. ¶¶ 8, 65.) The Company also announced new FY16 Goals. These Goals did not include a new EBIT Goal, but, as the Company explained, one of them "implie[d] an adjusted EBIT range with a midpoint around $7.2 billion." (Ex. E, 8/6/14 M&A Call Tr. 6.)

Over the rest of 2014, the Company prepared to complete the Alliance Boots merger. By the time Plaintiff filed the Complaint on December 29 and the merger closed on December 31, Walgreens's stock was trading at its highest prices in 2014.

## ARGUMENT

Walgreen Co. is an Illinois corporation, and therefore Illinois law governs whether Plaintiff may maintain this shareholder derivative action. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108–09 (1991). Under Illinois law, Plaintiff lacks standing for two distinct reasons. First, she did not make a pre-suit demand on the Walgreen Co. Board, and the Complaint does not plead with particularity that this failure was excused. Second, she is no longer a shareholder of Walgreen Co. The Court should therefore dismiss this case.

**I.      The Complaint Should Be Dismissed Because Plaintiff's Failure To Make A Pre-Suit Demand Was Not Excused.**

Plaintiff lacks standing to pursue this case because she did not make a pre-suit demand on the Walgreen Co. Board, and that failure was not excused.

## A.     The Complaint Must Be Dismissed Unless It Alleges Particularized Facts Establishing That Demand Would Have Been Futile.

It is a cardinal precept of corporate law that the "directors of a corporation and not its shareholders manage the business and affairs of the corporation." *Sherman v. Ryan*, 911 N.E.2d 378, 389 (Ill. App. Ct. 2009) (internal quotation marks omitted).  The right to manage a corporation's business and affairs includes the right to decide whether to litigate a claim of the corporation.  *Id.*  To protect this right and to avoid interference with the corporation's management, Illinois law imposes a demand requirement:  before a shareholder can sue in the corporation's name, she must "make a demand upon the board of directors to enforce a corporate right or demonstrate that extraordinary conditions exist to excuse such a pre-suit demand." *Silver v. Allard*, 16 F. Supp. 2d 966, 968 (N.D. Ill. 1998).

Indeed, Illinois courts have explained that the demand requirement is a crucial "precondition" that is intended "[t]o prevent shareholders from abusing" the derivative procedure.  *Schnitzer v. O'Connor*, 653 N.E.2d 825, 829 (Ill. App. Ct. 1995).  Under Illinois law, a shareholder's failure to make a demand precludes her from having derivative standing unless the Complaint pleads particularized facts establishing the extraordinary condition that a demand would have been futile.  *See, e.g.*, *id.*; *Silver*, 16 F. Supp. 2d at 968–69.

Federal Rule of Civil Procedure 23.1 requires that the reasons demand was supposedly futile be pleaded "with particularity."  *See Garza v. Belton*, 2010 WL 3324881, at *4–5 (N.D. Ill. Aug. 13, 2010).  This particularized pleading requirement is "a deliberate departure from the relaxed policy of notice pleading promoted elsewhere in the Federal Rules."  *Kamen v. Kemper Fin. Servs., Inc.*, 659 F. Supp. 1153, 1161 (N.D. Ill. 1987) (internal quotations omitted).

Plaintiff here did not make a demand (Cmplt. ¶ 78), and therefore she must satisfy the standard for pleading demand futility in order to have standing to pursue her claims derivatively.

**B.    To Plead Demand Futility, The Complaint Must Allege Particularized Facts Establishing That A Majority Of The Board Faces A Substantial Likelihood Of Liability.**

The Complaint contends that demand was futile solely because the directors would have to sue themselves, and so could not disinterestedly evaluate a demand.  (*See* Cmplt. ¶¶ 79–81.) Illinois law follows Delaware law on demand futility, including for claims based on alleged director liability.  *See, e.g.*, *Bronstein v. Austin*, 2008 WL 4735230, at *3 n.1 (N.D. Ill. May 30, 2008); *Powell v. Gant*, 556 N.E.2d 1241, 1245 (Ill. App. Ct. 1990).  Delaware law, in turn, imposes stringent pleading requirements for such claims.  Plaintiff must allege particularized facts establishing that, on the date the Complaint was filed, a majority of the Company's then-serving directors would not have been able to properly consider a demand because of their own personal financial interests.  *See Rales v. Blasband*, 634 A.2d 927, 932–36 (Del. 1993); *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984); *see also Higher Educ. Mgmt. Grp., Inc. v. Mathews*, 2014 WL 5573325, at *7 (Del. Ch. Nov. 3, 2014).  The "mere threat" of personal financial liability, however, does not render a director self-interested:  such a "bootstrap argument . . . would effectively abrogate [the demand requirement] and weaken the managerial power of directors."  *Aronson*, 473 A.2d at 818.  For demand to have been futile, the facts alleged in the Complaint must be "so egregious that a *substantial likelihood* of director liability exists." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995) (emphasis added).  It is a "rare case" that satisfies this standard.  *Id.*

Of course, directors can only face a substantial likelihood of liability on claims for which they could face personal financial exposure.  *See Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008). Plaintiff's pleading burden is thus further heightened by the exculpatory provision in Walgreen Co.'s charter, which immunizes directors from all personal financial liability except for breaches of their fiduciary duty of loyalty.  (*See* Ex. F, Walgreen Co. Articles of Incorporation at Article

VIII.)  *See also Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) (explaining that the duty of good faith is part of the duty of loyalty).  To establish a breach of the duty of loyalty, the Complaint must plead "particularized facts that demonstrate that the directors acted with scienter, i.e., that they . . . [i] *knowingly* violated a fiduciary duty or [ii] failed to act in violation of a *known* duty to act, demonstrating a *conscious* disregard for [their] duties."  *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009); *see also In re Abbott Depakote S'holder Deriv. Litig.*, 909 F. Supp. 2d 984, 993 (N.D. Ill. 2012).

The Complaint does not meet this high burden.

### C. The Complaint Fails To Allege Particularized Facts Establishing That A Majority Of The Board Faces A Substantial Likelihood Of Liability.

Plaintiff claims that a majority of the Board faces a substantial likelihood of liability for breaches of the fiduciary duty of loyalty based on allegedly improper public statements regarding the EBIT Goal (Cmplt. ¶¶ 79, 81) and regarding the Company's internal controls (*id.* ¶ 80).  Plaintiff is incorrect on both points.[6]  The directors also do not face a substantial likelihood of liability that would prevent them from considering a demand because the Complaint fails to allege that the Company has suffered any damages for which the directors could face personal financial exposure (*see id.* ¶¶ 72–74).

---

[6] Counts II and III, for waste and unjust enrichment, seek recovery of directors' compensation based on the breaches of fiduciary duty alleged in Count I.  (*See* Cmplt. ¶¶ 92–99.)  These Counts thus stand or fall with Count I, and they cannot independently create a substantial likelihood of liability for the directors.  *See Sadler v. Retail Props. of Am., Inc.*, 2014 WL 2598804, at *21 (N.D. Ill. June 10, 2014); *In re China Automotive Sys. Inc. Deriv. Litig.*, 2013 WL 4672059, at *10 (Del. Ch. Aug. 30, 2013).

1. **The Complaint's Allegations Regarding The EBIT Goal Statements Do Not Establish That A Majority Of The Board Faces A Substantial Likelihood Of Liability.**

The Complaint identifies seven allegedly improper statements about the EBIT Goal that were made before its withdrawal in June 2014. All seven were made by members of senior management in their capacity as such (former CFO Miquelon or former CEO Wasson) between October 2013 and March 2014. (*See id.* ¶¶ 49–58.) The Complaint does not allege that any of the statements were made by or on behalf of the Board, that the Board was involved in their preparation, or that the Board reviewed the statements or supporting analysis ahead of time. The EBIT Goal claim thus seeks to hold the Board liable for the actions of others.

This claim—that the Board failed to properly supervise management—is premised on the oversight standard set out in the seminal case *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959, 971 (Del. Ch. 1996). *See also, e.g.*, *Guttman*, 823 A.2d at 495–96, 506–07 (*Caremark* claim based on alleged public misstatements by management); *In re China Automotive Sys. Inc. Deriv. Litig.*, 2013 WL 4672059, at *7–10 (Del. Ch. Aug. 30, 2013) (same). Plaintiff has imposed a very high bar on herself in order to proceed here. A *Caremark* claim is "'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'" *Stone*, 911 A.2d at 372. To establish a substantial likelihood of liability on a *Caremark* claim, the Complaint must plead particularized facts showing "a sustained or systematic failure of the board to exercise oversight," such that the directors were "conscious of the fact that they were not doing their jobs." *Guttman*, 823 A.2d at 506 (internal quotation marks omitted); *see also Kuberski v. O'Rourke*, 2014 WL 1227630, at *4 (N.D. Ill. Mar. 25, 2014). Since Plaintiff does not allege "an utter failure to attempt to assure [that] a reasonable information and reporting system exists," *In re Caremark*, 698 A.2d at 971, the Complaint must allege particularized facts showing that the directors knew of the alleged misconduct, knew it

was wrongful or illegal, and in bad faith refused to do anything about it.  *See, e.g.*, *South v. Baker*, 62 A.3d 1, 14–15, 17–18 (Del. Ch. 2012); *Kuberski*, 2014 WL 1227630, at \*4.

Plaintiff has alleged no such particularized facts here.  In particular, the Complaint fails to plead particularized facts showing that the directors knew that the EBIT Goal statements were improper yet consciously did nothing.  Plaintiff instead asks the Court to infer Board knowledge of impropriety based on three purported "red flags":  internal analyses from 2013 that included preliminary estimates of FY16 EBIT that were lower than the Goal; the rise of generic drug prices in the second half of 2013; and the Medicare Part D reimbursement pressure faced by the Company in the spring of 2014.  (*See* Cmplt. ¶¶ 46–61, 79.)  *Cf. South*, 62 A.3d at 14–15 (discussing the use of "red flags" to show directors' knowledge).  None of these even support the inference Plaintiff seeks, let alone satisfies Plaintiff's high pleading burden.

The Complaint's first supposed red flag is that two internal estimates of FY16 EBIT were provided to the Board prior to the last affirmation of the EBIT Goal in March 2014:  a July 2013 estimate of $8.7 billion (Cmplt. ¶ 49) and a "late 2013" estimate of $8.5 billion (*id.* ¶ 51).  Based on these bare numbers, Plaintiff contends that the Board knew that it was improper for Miquelon and Wasson to repeat the EBIT Goal (as they did in all seven challenged statements) or to say that the Company "remain[ed] focused" on reaching the Goal (as they did in the four statements between December 2013 and March 2014).  (*See* Cmplt. ¶¶ 49, 52–54, 56–58; *see also, e.g.*, Ex. A, 10/1/13 Earnings Call Tr. 9 (Miquelon saying only that he was "reminding [investors] of [the Company's] fiscal 2016 goals" and then listing all five FY16 Goals); Ex. C, 3/25/14 Earnings Call Tr. 7–8 (Miquelon stating that they "continue to recognize that there are risks to achieving [the EBIT Goal], however [they] remain focused on delivering it").)  But the mere fact that, in the second half of 2013, the Company was not currently on track to reach $9 billion in EBIT in

2016 cannot reasonably give rise to an inference that the Company should have immediately withdrawn the EBIT Goal, much less that the Board must have known that it had to do so.

Nor does the size of the potential shortfall identified in the 2013 estimates reasonably lead to an inference that the Board knew that it had to abandon the Goal as no longer reasonably achievable. The 2013 internal estimates cited in the Complaint suggested a potential shortfall of $0.3 to $0.5 billion—which was only 3 to 6 percent of the EBIT Goal. Given that the Company had three years in which to close this potential gap, there is no cognizable basis to conclude that the Board knew or believed at the time that there was no reasonable possibility that the Goal could be achieved. The question is not whether, in hindsight, the Goal ultimately proved not to be achievable. Instead, the relevant issue is whether, *based on the information available at the time*, there is a "substantial likelihood" that a majority of the Board *actually knew* there was no possibility that the Goal could be met. *See In re Abbott Depakote*, 909 F. Supp. 2d at 996–99. The Complaint contains no such allegations.

In fact, the public statements between December 2013 and March 2014 on which the Complaint relies actually confirm that the Board *had* a basis to believe the EBIT Goal could still be achieved in 2016. In each of these statements, Miquelon and Wasson acknowledged that the Company was not currently on track to reach the EBIT Goal but identified additional opportunities that could, over the course of the next three years, help the Company make up ground. For example, on the December 2013 earnings call, Miquelon recognized that there were "risks to achieving [the EBIT Goal]" and said that the Company had "identified a range of further opportunities, including benefits of our [recently announced] AmerisourceBergen relationship, incremental Alliance Boots synergies, business expansion and new initiatives, and accelerated cost savings, all [of] which can help mitigate these risks." (Ex. B, 12/20/13 Earnings

Call Tr. 7, 15; *see also* Cmplt. ¶¶ 54, 56–58; Ex. C, 3/25/14 Earnings Call Tr. 7–8 (making the same statements).)[7]  There was thus no reason for the Board to have known, based on the two 2013 estimates cited in the Complaint, that there was no reasonable possibility that the Goal could be achieved.[8]  Indeed, the Complaint does not allege any facts suggesting that, through March 2014, the EBIT Goal could not, in fact, be achieved.  This alleged "red flag" does not plead that the directors knew of alleged misconduct, knew it was wrongful or illegal, and in bad faith refused to respond.  *See South*, 62 A.3d at 14–15; *Kuberski*, 2014 WL 1227630, at *4.

The Complaint's second and third purported red flags are equally unavailing.  Plaintiff alleges no particularized facts regarding what the Board was told about generic drug price inflation—such as when it began, how significant the price increases had been, what the rate of change was, or whether the inflation was expected to be a short-term divergence or a long-term trend—let alone when the Board was told such information.  Instead, the Complaint pleads that, by January 2014, prices for "many essential generic drugs" had increased "by as much as 600%, 1,000% or more" and that the media covered generic drug price inflation in 2014.  (Cmplt. ¶ 46.)  It then asserts that the Board must have known, somehow, sometime, that "generic drug prices

---

[7] The Complaint repeatedly asserts that Miquelon and Wasson "tout[ed]" that Walgreens was on track to achieve an EBIT of $9 billion to $9.5 billion in 2016."  (Cmplt. ¶ 79; *see also id.* ¶¶ 6, 48.)  In fact, none of the October and November 2013 statements commented on the Company's progress towards the Goal.  The Complaint alleges that Miquelon said on the October 2013 call that the Company "expected" to reach the EBIT Goal; he did not.  (*Compare* Cmplt. ¶ 49 *with* Ex. A, 10/1/13 Earnings Call Tr. 9.)  Nor did Miquelon "boast[]" at a November 2013 conference "that the Company was 'in a [sic] good stead' to achieve" the EBIT Goal.  (Cmplt. ¶ 53.)  In fact, the "good stead" comment was made regarding the revenue goal, not the EBIT Goal.  (Ex. G, 11/20/13 Conference Tr. 12–13.)

[8] Plaintiff also quibbles with the content of Miquelon's and Wasson's statements that the Company was not on track to achieve the Goal.  The Complaint notes that on the December 2013 earnings call, Miquelon said that the Company was tracking "a bit below" the compound annual growth rate (CAGR) required to achieve the Goal (Cmplt. ¶ 54), and that at a conference the first week of January 2014, Wasson said that the Company was tracking "a little bit below" the required CAGR (*id.* ¶ 56).  But the Complaint does not contain any particularized facts suggesting that this was wrong.

were skyrocketing." (*Id.* ¶ 79.)  This blatantly conclusory allegation of Board knowledge does not suffice to excuse demand.  *Cf. Citigroup*, 964 A.2d at 134–35 (explaining that the cited red flags "amount to nothing more than indications of worsening economic conditions" and so do not demonstrate knowledge by the board).

Nor do Plaintiff's allegations regarding Medicare Part D reimbursement pressure withstand scrutiny.  The Complaint does not allege that the Board learned anything about this issue until April 2014.  (Cmplt. ¶ 60; *see also id.* ¶ 58 (suggesting obliquely that this reimbursement pressure was noticed by management in March 2014).)  Information learned in April 2014 cannot show that the Board knew at the time that the October 2013 through March 2014 statements were improper.[9]

In short, none of Plaintiff's claimed "red flags" show that the Board knew that any EBIT Goal statement was improper, let alone that the Board consciously did nothing in response. Rather, the Company's public statements demonstrate that it responsibly and timely disclosed

---

[9] The Complaint's other allegations regarding post–March 2014 events (*e.g.*, Cmplt. ¶¶ 60–70) are also not relevant to demand futility.  The Complaint does not allege any EBIT Goal statements between March and June 2014, nor does it allege that the Board faces liability for statements made in June 2014 when the Company withdrew the EBIT Goal.  (*See, e.g.*, Cmplt. ¶ 79 (claiming that the directors face a substantial likelihood of liability because they "repeatedly caused or allowed the Company's fiduciaries to tout that Walgreens was on track to achieve an EBIT of $9 billion to $9.5 billion in 2016, and that the Company remained focused on delivering that goal").)  Nor would such a claim make sense.  Plaintiff cannot explain how the June 2014 statement that the Company would not meet the EBIT Goal was improper in any way, much less how the Board should have recognized it to be illegal.  The Company discussed the factors behind the withdrawal—generic drug price inflation and Medicare Part D reimbursement pressure—extensively during the June 2014 earnings call, and explained that once it finished further analysis regarding its performance and the completion of the Alliance Boots merger, it would announce new Goals.  (*See generally* Ex. D, 6/24/15 Earnings Call Tr.)  *See also, e.g.*, *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 516 (7th Cir. 1989) (explaining that firms need not reveal internal estimates, whether or not complete and whether or not other estimates have been publicly disclosed); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997) (Alito, J.) ("The federal securities laws do not obligate companies to disclose their internal forecasts.").

appropriate information about the EBIT Goal and the Company's progress towards achieving it. The Complaint therefore falls far short of pleading the kind of sustained and egregious failure to act in the face of a known duty that is required for a substantial likelihood of liability on a *Caremark* claim.[10] *See, e.g.*, *South*, 62 A.3d at 14–15; *Guttman*, 823 A.2d at 495–96.

### 2. The Complaint's Allegations Regarding The Internal Controls Statements Do Not Establish That A Majority Of The Board Faces A Substantial Likelihood Of Liability.

The Complaint's second theory of fiduciary duty liability is based on statements made regarding the Company's internal controls in five SEC filings. (*See* Cmplt. ¶¶ 50, 55, 59, 63, 68.) Plaintiff alleges that, contrary to the filings, the Company's internal controls were not effective, and therefore a majority of the Board faces a substantial likelihood of liability. (*Id.* ¶ 80.)

Two of the allegedly improper SEC filings—the 2013 and 2014 Form 10-Ks—were signed by the directors (*see id.* ¶¶ 50, 68), and thus the Complaint arguably asserts a direct duty-of-disclosure claim against the Board. *See In re Citigroup*, 964 A.2d at 132–35. The rest of the challenged SEC filings were Form 10-Qs that were only signed by CFO Miquelon (*see* Cmplt. ¶¶ 55, 59, 63), and so present only a *Caremark* claim. *See Guttman*, 823 A.2d at 506–07. Regardless of the theory, Plaintiff's internal controls claim fails to establish a substantial

---

[10] A second flaw in Plaintiff's EBIT Goal claim is that the Complaint fails to properly plead that the statements actually were improper, which of course is a necessary element of a claim that the Board knew that illegal conduct was occurring and egregiously failing to respond. *See Marvin H. Maurras Revocable Trust v. Bronfman*, 2013 WL 5348357, at *22–23 (N.D. Ill. Sept. 24, 2013). As noted above, the EBIT Goal statements were forward-looking statements accompanied by meaningful cautionary language, and so are immunized from private securities liability. *See* 15 U.S.C. § 78u–5(c)(1)(A)(i). And, as suggested by the analysis above, the Complaint does not adequately plead that any of the statements were false or misleading, let alone plead that Miquelon or Wasson made the statements with scienter or without being adequately informed. *See Marvin H. Maurras Revocable Trust*, 2013 WL 5348357, at *22–23 (addressing inadequate pleading of disclosure violations by management that allegedly give rise to a substantial likelihood of director liability in a derivative case).

likelihood of director liability because there are no particularized facts showing that a majority of the Board knew that any internal controls were ineffective at any time. *See In re Citigroup*, 964 A.2d at 132–35 (such knowledge is required for a duty-of-disclosure claim); *South*, 62 A.3d at 14–15 (such knowledge is required for a *Caremark* claim).

In this regard, the Complaint is entirely conclusory—it makes no attempt to identify with particularity what internal controls were allegedly ineffective, how they were ineffective, when they were ineffective, or when the Board supposedly learned that. Instead, the Complaint's primary theory appears to be that some internal controls must have been ineffective because they did not prevent the EBIT Goal statements from being made. (*See* Cmplt. ¶ 80.) But this distorts the inquiry in a failure of oversight claim. The relevant question is whether the directors *knew* of insufficient controls and failed to act in the face of that information. *See Stone*, 911 A.2d at 370 ("[I]mposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations."). Plaintiff makes *no* particularized allegations that a majority of the Board possessed such knowledge. Moreover, courts have regularly rejected the flawed hindsight reasoning that because issues allegedly occurred, internal controls must have been inadequate. *See, e.g.*, *Marvin H. Maurras Revocable Trust v. Bronfman*, 2013 WL 5348357, at *5 (N.D. Ill. Sept. 24, 2013) ("Delaware courts routinely reject the conclusory allegation that because illegal behavior [allegedly] occurred, internal controls must have been deficient, and the board must have known so."); *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007) (rejecting such allegations).

The Complaint tries to buttress the internal controls claim by pleading that Wasson and director Stefano Pessina purportedly told certain investors that "the Company had 'lax internal controls.'" (Cmplt. ¶ 67.) That claim relies on a heroic series of assumptions: (i) this statement

was made; (ii) it was true; (iii) it related to whatever unspecified internal controls Plaintiff believes were ineffective; (iv) these controls had anything to do with the EBIT Goal; and (v) that "lax" is the same as "ineffective" for purposes of SEC filings. But even so, this allegation does not save the Complaint because there is absolutely no pleaded basis to impute this statement, or even knowledge that it was made, to a *majority* of the Board. *Cf. Postorivo v. AG Paintball Holdings, Inc.*, 2008 WL 553205, at *7 (Del. Ch. Feb. 29, 2008) (demand futility based on a substantial likelihood of liability is "necessarily a detailed, fact-intensive" analysis that must be done on a "director-by-director" basis). And absent particularized facts showing that at least seven directors knew the challenged internal controls statements were improper, demand was not excused.[11] *See id.*

### 3. The Complaint's Allegations Regarding Speculative Damages To Walgreens Do Not Establish That A Majority Of The Board Faces A Substantial Likelihood Of Liability.

The Complaint also fails to adequately plead demand futility because it alleges only speculative damages. A substantial likelihood of liability can excuse a shareholder's failure to make a demand because the directors would face a "personal financial interest" when evaluating the demand. *See Rales*, 634 A.2d at 935–36. But where the only alleged damages are speculative, there is no basis to conclude that the directors would actually have a disabling personal financial interest. *Cf. Bronstein*, 2008 WL 4735230, at *5–6.

The Complaint pleads two theories of damages to the Company from the EBIT Goal and internal controls statements, neither of which suffices to establish a substantial likelihood of actual liability for money damages. First, the Complaint asserts that Walgreens's "credibility" and "reputation" have been harmed. (Cmplt. ¶ 72–73.) This, Plaintiff claims, means that

---

[11] The Complaint's other allegations regarding Wasson, Pessina, Miquelon, and the financial reporting process are similarly unconnected to a majority of the Board (*see* Cmplt. ¶¶ 61, 67–68), and so fail to excuse demand.

"[b]usinesses are less likely to award contracts to [Walgreens]," and the Company's ability to raise capital or debt "on favorable terms in the future is now impaired." (*Id.*) This is patently speculative—Plaintiff alleges no specific, concrete business losses. *See In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 922 F. Supp. 2d 445, 474 (S.D.N.Y. 2013) (rejecting similarly bare assertions of reputational harm as speculative).

Plaintiff's suggestion that the damage to Walgreens's credibility is "reflected by the Company's almost $9.5 billion, or 14.3% market capitalization loss" on August 6, 2014 (Cmplt. ¶ 72), does not help her. Even assuming that this stock price drop was because of the EBIT Goal rather than the Company's decision not to undertake a tax inversion, this is a theory of damages *to investors*, not damages that the directors could owe to the Company. Moreover, the stock bounced back fully within four months, so Plaintiff can make no claim of sustained or concrete harm to the Company.[12]

Second, the Complaint alleges that the Company has suffered damages in the form of legal fees and potential settlements or judgments incurred in securities class actions and the Miquelon litigation. (Cmplt. ¶ 74.) But courts regularly conclude that damages that are contingent on the outcome of other lawsuits are speculative for purposes of derivative litigation. *See, e.g.*, *In re Facebook*, 922 F. Supp. 2d at 474 ("'[D]erivative claims are foreclosed when they merely allege damages based on the potential costs of investigating, defending, or satisfying a judgment or settlement for what might be unlawful conduct.'").

Moreover, the lawsuits to which Plaintiff was referring cannot support damages here. The only securities class actions pending when the Complaint was filed are two M&A suits that

---

[12] On August 5, 2014, Walgreens's stock closed at $69.12; on December 11, 2014, it closed at 73.01; and on December 31, 2014, it closed at $76.20. *See* Yahoo Finance, http://finance.yahoo.com/q/hp?s=WBA&a=07&b=5&c=2014&d=11&e=31&f=2014&g=d.

allege securities violations based on the disclosures for the shareholder vote on completing the Alliance Boots merger. *See Hays v. Babiak*, No. 14-cv-09786 (N.D. Ill. filed Dec. 5, 2014); *Potocki v. Skinner*, No. 14-cv-10006 (N.D. Ill. filed Dec. 12, 2014). Those suits have nothing to do with the conduct for which Plaintiff seeks to hold the directors liable, and so costs related to those suits cannot serve as damages in this case.[13] Nor does the Complaint seek to hold the Board liable for the alleged post–August 2014 events that are described in Miquelon's employment claims. There is thus no basis to conclude that the Board could not impartially consider a demand on the date the Complaint was filed.[14]

\*       \*       \*

Plaintiff has failed to plead particularized facts showing that this is one of the rare cases where the directors' conduct was so egregious that they face a substantial likelihood of personal liability. Demand was not excused, and the Complaint should be dismissed.

## II.     The Complaint Should Also Be Dismissed Because Plaintiff Is No Longer A Walgreen Co. Shareholder Following the Merger With Alliance Boots.

As explained above, on December 29, 2014—the date the Complaint was filed—the Walgreen Co. Board could have properly considered a demand, and therefore Plaintiff was required to make a demand rather than file this lawsuit. Plaintiff could have made a demand on

---

[13] When the Complaint was filed, there were no securities class actions based on the EBIT Goal or internal controls statements at issue in this suit. However, on April 10, 2015—the day this motion to dismiss was filed—a purported securities class action regarding certain EBIT Goal statements was also filed. *See Washtenaw Cnty. Emps. Ret. Sys. v. Walgreen Co.*, No. 1:15-cv-03187 (N.D. Ill. filed April 10, 2015). Since this new securities class action was filed well after the date of the Complaint, it is not relevant to demand futility. *See Higher Educ. Mgmt. Grp.*, 2014 WL 5573325, at \*7 (explaining that a derivative plaintiff must show that the directors faced a substantial likelihood of personal financial exposure on the date the complaint was filed). Further, allegations of damages related to this securities suit would be speculative for purposes of this derivative litigation. *See, e.g.*, *In re Facebook*, 922 F. Supp. 2d at 474.

[14] The Complaint's claim that the directors may be liable for their compensation is also speculative, and these alleged damages were not caused by the EBIT Goal or internal controls statements.

the Walgreen Co. Board on December 29 because she was, at that time, a Walgreen Co. shareholder.  (*See* Cmplt. ¶ 13.)  But on December 31, her shares in Walgreen Co. were converted to shares in WBA pursuant to the completion of the Alliance Boots merger.  (*See* Walgreens 12/31/14 Press Release.)  After that date, Plaintiff could have made a demand on the WBA Board.  However, under settled law, the share conversion deprived her of standing to pursue claims on behalf of Walgreen Co. in *this* suit, regardless of her failure to make a demand.

"Illinois and Delaware law are identical on who may maintain derivative actions:  in order to bring a shareholders derivative suit, plaintiff must be a shareholder both at the time of the transaction of which he complains *and during the pendency of the action*."  *Weil v. Nw. Indus., Inc.*, 522 N.E.2d 172, 174 n.1 (Ill. App. Ct. 1988) (emphasis added).  As the Delaware Supreme Court has explained, a "plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit."  *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984); *see also Weil*, 522 N.E.2d at 174 n.1 (citing *Lewis* and stating that a derivative suit could not be brought because the plaintiff no longer owned stock as the result of a merger).  The December 31, 2014, completion of the Alliance Boots merger eliminated Plaintiff's shareholder status in Walgreen Co., and as a result she lost any possible standing to pursue litigation on Walgreen Co.'s behalf.  *Cf. In re Gen. Instrument Corp. Secs. Litig.*, 2000 WL 1742120, at *2 (N.D. Ill. Nov. 22, 2000) (holding at the summary judgment stage, five years after the case was filed, that a shareholder no longer had derivative standing because of a recent merger).[15]

---

[15] Neither of the rarely applied equitable exceptions to this standing requirement fit here.  First, the Alliance Boots merger was unquestionably not a fraud designed to eliminate Plaintiff's suit, including because the merger was announced more than a year before the events that are the basis of the Complaint.  *See Lewis v. Ward*, 852 A.2d 896, 899 (Del. 2004).  Second, the merger was far more than a "mere reorganization" of the pre-existing Walgreen Co. entity because it

If Plaintiff remains a WBA shareholder and wishes to pursue her substantive allegations after dismissal, she can (still) make a demand on the WBA Board.  *Cf. In re Massey Energy Co.*, 2011 WL 2176479, at *2 (Del. Ch. May 31, 2011) (opinion by current Delaware Supreme Court Chief Justice Strine).  But this Complaint should be dismissed for lack of standing.

## <u>CONCLUSION</u>

For the foregoing reasons, the movants request that the Court dismiss the Complaint.

Dated:  April 10, 2015

Respectfully submitted,

<u>*/s/ Kristen R. Seeger*</u>

Kristen R. Seeger (No. 6278416)
James W. Ducayet (No. 6236997)
John M. Skakun III (No. 6297636)
Elizabeth Y. Austin (No. 6308514)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois  60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
kseeger@sidley.com
jducayet@sidley.com
jskakun@sidley.com
laustin@sidley.com

*Attorneys for Nominal Defendant
Walgreen Co.*

<u>*/s/ Thomas B. Quinn*</u>

Thomas B. Quinn
David C. Blickenstaff
Virginia O. Hancock
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 6600
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
tquinn@schiffhardin.com
dblickenstaff@schiffhardin.com
ghancock@schiffhardin.com

*Attorneys for Defendants Gregory D. Wasson,
James A. Skinner, William C. Foote, Stefano
Pessina, Alan G. McNally, Nancy M.
Schlichting, Alejandro Silva, Steven A. Davis,
Mark P. Frissora, Ginger L. Graham, David J.
Brailer, Dominic P. Murphy, Janice M.
Babiak, and David Y. Schwartz*

---

combined "two distinct corporations, each with its own board of directors, officers, assets and stockholders," *see id.* at 904.

## CERTIFICATE OF SERVICE

Elizabeth Y. Austin hereby certifies that on April 10, 2015, she caused the foregoing document to be electronically filed using the CM/ECF system, which will send notice of this filing to all counsel of record.

*/s/ Elizabeth Y. Austin*